(No. 13816.—Judgment affirmed.)

JOSEPH P. SOUCIE, Admr. Defendant in Error, *vs.* JOHN
    BARTON PAYNE, Director General of Railroads, Plain-
    tiff in Error.

*Opinion filed October 22, 1921—Rehearing denied Dec. 7, 1921.*

1. RAILROADS—*ordinance limiting speed of passenger trains to
ten miles per hour is prima facie valid.* Cities and villages have
the right by ordinance to limit the speed of passenger trains to ten
miles an hour in accordance with the statute, and such an ordi-
nance cannot be declared invalid upon the ground that it imposes an
unreasonable restriction upon interstate commerce and the speedy
transportation of mail unless it is clearly made to appear that there
is no necessity for such ordinance for the public safety.

2. SAME—*Federal Control act does not deprive cities of right to
regulate speed of trains.* The Federal Control act, giving the Fed-
eral government control of interstate railroad lines, does not take
from the cities through which the roads pass their right to regu-
late the speed of trains according to the State laws, as section 10
of the act provides that the carriers, while under Federal con-
trol, shall be subject to all laws and liabilities as common carriers,
whether arising under State or Federal laws or at common law.

3. NEGLIGENCE—*when ordinance as to guarding of a railroad
crossing should be admitted in evidence.* In an action for wrong-
ful death resulting from a collision of an automobile with a train
at a street crossing, plaintiff should be permitted to introduce in
evidence, without preliminary proof as to its reasonableness, an
ordinance of the village requiring gates and a watchman at the ·
crossing, where the defendant has introduced no proof that such
an ordinance is unreasonable.

4. SAME—*when evidence of the deceased's reputation for care
is properly admitted though subsequently excluded.* In an action
for wrongful death resulting from a collision of an automobile
with a train at a crossing, the plaintiff, upon stating there was no
eye-witness, may be allowed to introduce evidence of the general
reputation of the deceased as to care, even though the defendant
objects and tenders to the plaintiff an alleged eye-witness of the
accident, but when the defendant subsequently calls such witness,
who testifies that he was an eye-witness, the reputation evidence
is properly excluded.

5. SAME—*it is a question for the jury whether deceased was in
exercise of due care.* In an action for the death of a passenger in
an automobile which collided with a train at a railroad crossing,

it is a question 'for the jury, under all the evidence, whether or not the deceased was in the exercise of due care for his safety and as to whether or not he relied upon the operation of the traffic gates and the signal bell at the crossing.

WRIT OF ERROR to the Circuit Court of Iroquois county; the Hon. FRANK L. HOOPER, Judge, presiding.

FREE P. MORRIS, and ROSCOE C. SOUTH, (HOMER T. DICK, and C. O. FOWLER, of counsel,) for plaintiff in error.

C. HELMER JOHNSON, and CLAUDE N. SAUM, (ARTHUR H. CHETLAIN, and JOHN T. MURRAY, of counsel,) for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Joseph P. Soucie, administrator of the estate of Russell Soucie, deceased, recovered a judgment in the sum of $4200 against John Barton Payne, agent under Federal control of the Chicago and Eastern Illinois Railroad Company, for the death of Soucie, in the circuit court of Iroquois county. The record has been brought directly to this court for review by writ of error, as the constitutionality of a statute is involved.

Russell Soucie, son of Joseph Soucie, was of the age of nineteen years and lived on a farm with his father near the village of St. Anne, in Kankakee county, which village had a population of about 1400 at the time of the accident. About 11:30 P. M. on August 23, 1919, two persons whose names are not disclosed were riding with the deceased in an automobile, and in attempting to cross the railroad of plaintiff in error at Station street crossing, which is the first street crossing south of the depot in the village, all were killed by a collision of an interstate passenger train of plaintiff in error with the automobile. The railroad there runs north and south and the street east and west, and the parties in the automobile were traveling east. The depot is

situated about 115 feet north of Station street crossing and is used by both the Chicago and Eastern Illinois Railroad Company and the Big Four Railroad Company and is located on the east side of the Chicago and Eastern Illinois railroad. The Big Four runs through the village from the southeast to the northwest and crosses the Chicago and Eastern Illinois about 425 feet north of Station street crossing. At the northwest corner of the junction of the Big Four and Chicago and Eastern Illinois is the tower in which are located the lever and signal apparatus of the respective railroads. The Big Four intersects Station street about 225 feet east of the crossing at which the accident occurred. There is a small gate house on the east side of the Chicago and Eastern Illinois and north of Station street, from which the gates at said crossing are operated by the gateman during the day time. An automatic gong or crossing bell sits on a post on the west side of the crossing north of Station street, which is operated from the tower to the north. The crossing is a level one at grade with the railroad and is 60 feet wide. As the railroad at this crossing is approached from the west the first track crossed is a switch or house track. The second one crossed, going east, is the main or south-bound track,—the track on which the train was running that killed deceased. The third track so crossed is a north-bound track, on which a freight train of sixty cars was running north across the crossing at the rate of eight or ten miles an hour and making a great deal of noise. The record does not disclose the exact distance between the house track and the south-bound track, but an examination of a number of photographs of this crossing indicates that that distance cannot be over 12 or 15 feet at the outside. While the freight train was crossing the street three automobiles were waiting for some time, the east one standing about 15 feet west of the south-bound track, the next one being about 30 feet west of the south-bound track, and the third automobile, in which the de-

ceased was riding, was still further west, the distance not being given, but the evidence shows that it was not far behind the second auto. The first two automobiles crossed the south-bound track safely, but the rear automobile was struck by the south-bound passenger train running at the rate of forty-five or fifty miles per hour, according to the testimony of the defendant in error's witnesses, and the occupants were thrown about 150 feet south and east onto the north-bound track and killed as aforesaid. None of the occupants of the first two automobiles saw or heard the passenger train while the freight train was passing or as they were crossing the tracks after it passed. Occupants of both cars testified that they looked and listened and could see no train north or south of them as they crossed the tracks. The occupants of the east car saw the passenger train when within about ten feet of the Big Four railroad crossing, and the train was at that time about one-half or three-quarters of a mile north of Station street crossing, according to the evidence. The occupants of the second car saw the light of the train when they were about 30 feet east of the crossing at Station street and the Chicago and Eastern Illinois, and the train was then about 75 feet north of the crossing. According to the testimony of the plaintiff in error's witnesses the passenger train could have been seen for a distance of a mile north of the crossing by any person standing just east of the switch or house track at Station street, as this train had a very bright headlight, which was giving light as it was approaching this crossing. Just after passing north of the tower house and the Big Four crossing the Chicago and Eastern Illinois, as appears from the photographs, bends very sharply to the northeast, which would be more favorable for one standing on the house track to see the train than it would for one on the south-bound track, as there are some buildings northward tending to obstruct the view from the latter situation. It is also testified by plaintiff in error's witnesses that the trainmen blew

the engine whistle north of the switch tower for the station and also for a road crossing, and that the engine bell and the crossing bell were ringing as the train approached Station street crossing. The witnesses that were in the two automobiles that crossed the crossing safely testified that they heard the signal bell at the crossing as the freight train passed and heard the bell on the freight engine but heard no other signals. It was also proven that at the time of the accident, and just before it, there was no flagman on the crossing and that the gates or upright bars were not operated or thrown across the street to warn travelers from crossing. The evidence shows that these gates have been in existence at this crossing since 1903, and were used and operated by the railroad company in the day time but not usually at night, and that a flagman was also kept at the crossing in the day time to give like warning.

There were ten counts in the declaration, which charged general negligence; that the train was running at a high and dangerous rate of speed; that it gave no warning of its approach by bell or whistle; that the train was running in excess of the speed ordinance of the village; that the gates at the crossing were not operated, and that there was no watchman guarding the crossing, as required by the village ordinance. At the close of the evidence the court directed a verdict as to the counts alleging failure to operate the gates and to have a watchman at the crossing. The court excluded the ordinance which required the railroad company to provide and keep a watchman and gates at said railroad crossing during all hours trains and engines were running up and down the track and to keep the gates closed when engines and trains of cars were passing or about to pass over the crossing. It also made it the duty of the watchman to signal and warn persons passing in the direction of the crossing when there was danger from the approach of locomotive engines, cars or trains. The court permitted defendant in error to introduce two other ordi-

nances of the village, one of which provided that no passenger train shall be driven, propelled or run upon any railroad track within the village at a greater speed than ten miles an hour. The other ordinance provided that the bell of every locomotive engine shall be rung continually within 200 feet of and when approaching any street crossings.

Plaintiff in error insists that the court erred in admitting in evidence the ordinance regulating the speed of trains on the ground that it violates the Federal constitution in providing an unreasonable regulation of interstate commerce and is a direct burden upon the same; also insists that the statute of Illinois authorizing such an ordinance is for the same reason invalid. At the time the ordinance was introduced plaintiff in error sought to prove that the train in question, in making its run from Chicago to Evansville, Indiana, would have to pass through thirty-three cities and villages having like ordinances restricting the speed of passenger trains to ten miles an hour; that the schedule of the train as fixed by the Federal government between said two cities was nine hours and fifteen minutes, and that to comply with all of said speed ordinances, including that of the village of St. Anne, would lengthen the schedule four hours and fifty-seven minutes. The court refused to admit the evidence. We do not think the court erred in any of said rulings. The evidence of defendant in error tends to show that Station street is a much-traveled thoroughfare of the village, and that the crossing is a dangerous crossing by reason of the various structures or buildings already described in the near vicinity of the track north of this crossing and also by other buildings not heretofore mentioned, and on the night in question the house or switch track was further obstructed by cars thereon just north and within 30 feet of the street. There is no question but that this train was an interstate train running from Chicago, Illinois, to Jacksonville, Florida, and carrying passengers, baggage and United States mail. It has been frequently

decided by this court that cities and villages have the right to limit the speed of passenger trains by ordinance to ten miles an hour in accordance with the provisions of the statute of this State and that such a right is a well recognized police power of such municipalities. In the case of *Chicago and Alton Railroad Co. v. City of Carlinville,* 200 Ill. 314, this court held that before a court can hold such an ordinance invalid the want of a necessity for the same for the public safety must be clearly made to appear, and that, even though such a speed ordinance does have the effect to retard rapid transportation, it cannot be declared invalid upon the ground that it imposes an unreasonable restriction upon interstate commerce and the speedy transportation of mail. The views of this court have been fully expressed upon this question in that opinion, and as the decisions of the Supreme Court of the United States are in accord with our holdings in that case we must regard the question as settled and as requiring no further discussion. *Crutcher* v. *Kentucky,* 11 Sup. Ct. 851; *Erb* v. *Morasch,* 20 id. 819.

It is further contended by plaintiff in error that the Chicago and Eastern Illinois railroad at the time of this injury was being operated by the United States government on a fixed schedule of time. The fact that the railroad was being operated by the government in that manner under the Federal Control act is not a sufficient ground to make any change in the decisions of this court or of the Federal court upon that question. Section 10 of the Federal Control act provides that the carriers, while under Federal control, shall be subject to all laws and liabilities as common carriers, whether arising under the State or Federal laws or at common law.

The defendant in error's contention that the court erred in excluding the ordinance of the village requiring gates and a watchman at said crossing to guard and protect travelers while passing over the crossing must be sustained. As already stated, the evidence tended to show that the cross-

ing is a dangerous crossing, but the rule of this court as to such an ordinance is that it is admissible without preliminary proof, and that the burden is on the defendant to show that the ordinance is unreasonable because of the fact that the crossing is not dangerous or is unreasonable for some other sufficient reason. No such proof was offered. The ordinance was very material evidence in the case and the court should not have excluded it. (*Chicago and Alton Railroad Co.* v. *Averill,* 224 Ill. 516.) The proof, however, does show that the gates had been established and used at this crossing in question, in the day time at least, for fifteen years, and that a watchman was employed to guard the crossing, and did guard it, in the day time. It was also proved that the deceased crossed over this crossing very frequently,—as much as from three to six times a week in the day time,—and witnessed at such times when he crossed the railroad that the gates were dropped across the street to prevent his crossing when trains were approaching, and that the watchman was also guarding the crossing. It was also proved that he sometimes passed there in the night time, when the gates and the guard were not employed.

Defendant in error stated to the court that there was no eye-witness to the accident, and therefore asked permission of the court to prove the reputation of the deceased as to due care, etc. Counsel for the plaintiff in error objected and claimed that there was an eye-witness, and tendered the witness, who was the engineer on the passenger train, to the defendant in error. Defendant in error declined to use him as a witness, and the court ruled that it would admit the offered evidence of the defendant in error, as there was no showing before the court that there was an eye-witness. The engineer testified as an eye-witness for plaintiff in error. There was no error in this ruling of the court. It had the statement of the defendant in error and his counsel that there was no eye-witness, and in the absence of a posi-

tive showing by the plaintiff in error the court was warranted in admitting evidence as to the general reputation of the deceased as to due care, etc. When the engineer testified showing that he was an eye-witness, the court then excluded the evidence as to general reputation of the deceased. Defendant in error on his cross-assignment of errors insists that the court erred in its ruling, and plaintiff in error insists that he was prejudiced by the introduction of the evidence in the first place. We must sustain the action of the court in both particulars. Plaintiff in error had the witness present, by whom he might have shown by sworn evidence that he was, in fact, an eye-witness, before the evidence of reputation was admitted, but declined to do so. We think the court was right in excluding the evidence when it appeared by the testimony of the engineer that he was an eye-witness.

The engineer's testimony as an eye-witness simply bears upon the movements of the automobile as it crossed the tracks. The substance of his testimony in his first statement is, that just as he was passing the signal tower, which is over 400 feet north of the crossing, he undertook to give a crossing signal for the road crossing south of Station street; that as he made the first pull at his whistle he saw the lights of the automobile as it was crossing the switch or house track, and that it was traveling about twenty miles an hour as it went over the crossing; that as he glanced at the boys and the automobile he immediately put all of his endeavors on applying the emergency brakes and stopping the train. Later in his evidence he stated that the lights of the car were west of the house track but did not state how far west, and that he was himself 20 to 25 feet north, and that he put on the emergency brake, "and it was all over." He also testified that if the driver of the car, when he reached the west rail of the house track, had looked to the north he could have seen the train and that there would be nothing to obstruct his view; also that

in his judgment the automobile could have been stopped
within six or eight feet, although going twenty miles an
hour.   In his cross-examination he stated that at the time
he first saw the boys the front end of the engine was per-
haps 40 feet from the point of collision, and that they were
coming across the switch track when he first saw them.   It
will be observed that there is quite a discrepancy in the sev-
eral statements that the engineer makes as to his distance
from the crossing when he first saw the boys, the first state-
ment placing him near to or just as he was passing the
tower, or a point more than 400 feet north of the crossing,
the second statement at 20 or 25 feet north of the crossing,
and finally at about 40 feet north of the crossing.   It is
clear that the engineer was not very certain just where he
was when the boys were crossing the switch track,—a dis-
tance at most not more than 15 feet from the south-bound
track.

It will not be necessary to discuss the evidence in de-
tail.   We think it was a question for the jury, under all
the evidence, whether or not the deceased and his compan-
ions were in the exercise of due care for their safety.   If
the passenger train had been traveling not more than ten
miles an hour it is clear that the automobile would have
crossed the track in safety for the boys.   The circumstan-
tial evidence indicates that they were more over the track
than otherwise when the train struck the automobile, as it
was thrown to the east and not in a straight line down the
south-bound track.   The deceased had a right to assume
that the train would not exceed the ordinance limit of the
city, and the plaintiff in error was guilty of negligence in
this violation.   It was also a question for the jury, on the
evidence, as to whether or not the deceased expected the
gates to be operated against him if he was in danger.   It
is also morally certain that if on another trial the ordinance
requiring the operation of the gates and the presence of a
guard should be admitted in evidence the jury would be

299—36

warranted in the conclusion that the case would be stronger in favor of defendant in error, but, of course, this evidence cannot be regarded as in the record.

For the foregoing reasons our conclusion is that the judgment of the court should be, and it is accordingly, affirmed.

*Judgment affirmed.*